*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0430p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

J. RICHARD JAMIESON,

*Defendant-Appellant.*

Nos. 02-3403; 03-4578

>

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 02-00707—David A. Katz, District Judge.

Argued: March 15, 2005

Decided and Filed: October 28, 2005

Before: DAUGHTREY and CLAY, Circuit Judges; SCHWARZER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Susan Bogart, LAW OFFICES OF SUSAN BOGART, Chicago, Illinois, for Appellant. Seth Uram, UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee. **ON BRIEF:** Susan Bogart, LAW OFFICES OF SUSAN BOGART, Chicago, Illinois, for Appellant. Seth Uram, UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.

_____

## OPINION

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge. The defendant, Richard Jamieson, was convicted of two counts of conspiracy and 155 counts of money laundering, as the result of his ownership and operation of a business that purchased life insurance policies from terminally ill people and resold them to investors. He now appeals his convictions, contending that the evidence was insufficient to support the jury's verdict. He also faults the district court for: failing to recuse itself; restraining his assets and thereby depriving him of representation by counsel of his choice; authorizing insufficient funds for investigation and preparation of his defense; failing to grant a change of venue; permitting introduction of the government's Rule 1006 summaries into evidence; and denying his request for additional jury instructions. Jamieson further alleges that the government was guilty of misconduct in making certain prejudicial statements in closing argument

---

[*] The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

and, finally, he contends that he is entitled to be re-sentenced under *United States v. Booker*, 543 U.S. ___, 125 S.Ct. 738 (2005). We find no reversible error in connection with the defendant's convictions. The case must be remanded, however, for re-sentencing under *Booker*.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

The indictment returned against Jamieson alleged, first, that he had been involved in the purchase and sale of fraudulently obtained life insurance policies and, second, that he had made multiple fraudulent statements to investors for the purpose of inducing them to invest in those insurance policies through his company, Liberte Capital Group, a "viatical settlement company" located in Toledo, Ohio. According to the record, a viatical settlement company buys life insurance policies at a discount from terminally-ill persons, referred to as "viators," and markets the policies ("viaticals") for purchase by investors. Between 1996 and 2000, Liberte Capital purchased at least 950 life insurance policies, 95-99 percent of which insured men diagnosed as HIV-positive or with AIDS. Liberte Capital then sold these policies to approximately 2,250 investors for a sum of over $92 million.

The marketing of viaticals is legal, but their purchase carries financial risk to the investor. If a life insurance policy has been fraudulently obtained, the insurance company may rescind the policy and refuse to make any pay-outs, thus rendering the policy, and any investment in the policy, worthless. The record establishes that Jamieson was aware of the risk of investing in fraudulent viatical policies. For example, at a March 1998 meeting with Liberte Capital sales agents, Jamieson explained how viators could fraudulently obtain policies and the need to avoid such policies. As Jamieson explained, an individual with AIDS could answer falsely on insurance applications, indicating that he had no serious illnesses, and thus qualify for the life insurance. He noted that many insurance companies would issue policies with benefits of less than $100,000 without requiring blood tests or medical examinations and that viators often obtained multiple fraudulent policies of this sort.

The government alleges that, during the indictment period, Liberte Capital purchased at least 214 fraudulently-obtained life insurance policies. These 214 policies belonged to a total of 33 viators, each of whom sold at least five different policies to Liberte Capital. Furthermore, in approximately 61 percent of all the viaticals bought by Liberte Capital, the viator's date of HIV-positive or AIDS diagnosis actually *preceded* the date the policy was issued by the insurance company, thus indicating a high likelihood of fraud in the filing of the application. At trial, four viators explained to the jury how they had fraudulently obtained multiple life insurance policies for themselves and others and sold them to Liberte Capital.

The government presented significant evidence indicating that Jamieson knowingly covered up evidence of this fraud. Several witnesses testified that, after hearing about a government investigation into viatical brokers, Jamieson ordered his employees to remove and destroy the policy applications in every viator's file. The record also reflects that during a hearing in January 2000, Jamieson gave testimony under oath to the Ohio Department of Commerce's Division of Securities that Liberte Capital never reviewed the policies it purchased to determine whether they were fraudulent because (contrary to his earlier description of how viators obtain fraudulent policies) he "was unaware that people were applying for life insurance fraudulently." At the hearing, Jamieson further testified that he never informed investors of the possibility that some policies might be fraudulent and thus subject to rescission by the insurance companies. But beyond merely failing to warn investors of the risk of fraudulent policies, Jamieson specifically marketed Liberte Capital's viatical investments as "a safe purchase" and guaranteed their "security and safety."

The failure to inform investors of the risk of fraudulent policies was not the only misrepresentation Jamieson made. Liberte Capital developed marketing material for use by sales

agents in encouraging people to invest in Liberte Capital viaticals. Evidence in the record indicates that Jamieson, as the head of Liberte Capital, wrote or approved all the marketing materials and the investor contracts. At least 75 percent of the investor contracts promised that Liberte Capital would escrow funds sufficient to pay future premiums for twice the remaining life expectancy of each viator. In actuality, however, Liberte Capital escrowed funds according to the promised formula for only 2-5 percent of the life insurance policies. At one point, employees of the escrow company noted that the Liberte Capital escrow account was short by $19 million, but Jamieson and the head of the escrow company ordered them to complete the purchases of the policies. Liberte Capital also promised potential investors that none of the policies would be for individuals with life expectancies exceeding five years. In contrast, the government produced evidence showing that 81 policies, involving 751 investors, were for individuals with life expectancies in excess of five years. Finally, and perhaps most importantly, the Liberte Capital sales brochure promised investors that Liberte Capital would use a "totally independent escrow company," Viatical Escrow Services, to assure the safety of their investments. Several sales representatives testified that having an independent escrow service was of paramount importance to their client investors. Viatical Escrow Services was not, however, independent from Liberte Capital. Jamieson had an agreement with James Capwill, the owner of Viatical Escrow Services, that Capwill would invest Jamieson's profits from Liberte Capital and take a cut of the profits. Nevertheless, business relations between Capwill and Jamieson eventually soured, and Jamieson sued Capwill for embezzlement in early 1999.[1]

In 2002, Jamieson and 16 others were indicted for conspiracy to commit mail fraud. Jamieson was also charged with money laundering and conspiracy to commit money laundering. He pleaded not guilty and later went to trial, but 15 of his co-defendants pleaded guilty,[2] and many eventually testified against Jamieson. Immediately following the indictment, the court granted the government's ex parte motion to freeze all of Jamieson's assets. The restraining order was based on count 158 of the indictment, which charged Jamieson with conspiracy to commit money-laundering offenses involving over $104 million. Jamieson promptly moved to lift or modify the restraining order to enable him to retain counsel of his choice. Following a hearing, the district court denied his motion.

Because Jamieson's assets had been frozen, the trial court appointed two attorneys to represent him under the Criminal Justice Act. The district court also granted Jamieson's motion for CJA funds for investigation, experts, and analysts, but at a lower amount ($100,000) than Jamieson had requested ($500,000).

Jamieson filed numerous other pre-trial motions that were denied by the trial court and are now bases for this appeal. These included a motion for change of venue, another for the district judge to recuse himself, and objections to the government's use of Rule 1006 charts that summarized the data from the records seized from the Liberte Capital office and computers.

Following his conviction, Jamieson was sentenced to 60 months on the charge of conspiracy to commit mail fraud, 240 months on the charges of money-laundering and conspiracy to commit money laundering in counts 2-33, 35-100, and 158, and 120 months on those in counts 101-157, all to run concurrently. The court imposed a special assessment fee of $57,000 and restitution in the amount of $92,120,491. The district court denied Jamieson's motion for bail and a stay of forfeiture pending appeal, and we affirmed that decision. We now have before us the appeal on the conviction and the sentence imposed by the district court.

---

[1] Capwill was later prosecuted on criminal charges relating to Liberte Capital and was convicted on multiple counts of fraud and tax violations.

[2] The charge against co-defendant Robert Leonberger was dismissed pursuant to Fed. R. Crim. Pro. 48(a) and by leave of court.

## II. *DISCUSSION*

### A. Sufficiency of the Evidence

In reviewing a claim that a conviction is not supported by sufficient evidence, we assess the proof in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). However, we may not consider the credibility of witnesses or weigh the evidence. *See United States v. Marshall*, 248 F.3d 525, 536 (6th Cir. 2001).

To justify a conviction of conspiracy to commit mail fraud under 18 U.S.C. § 371, the evidence must show that Jamieson "knowingly and willfully joined in an agreement with at least one other person to commit an act of mail fraud and that there was at least one overt act in furtherance of the agreement." *United States v. Cantrell*, 278 F.3d 543, 546 (6th Cir. 2001). To establish a conspiracy, the government need not show an explicit agreement, but merely that the defendant "knew the object of the conspiracy and 'voluntarily associated himself with it to further its objectives.'" *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000) (quoting *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999)). Mail fraud consists of (1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme. *See United States v. Brown*, 147 F.3d 477, 483 (6th Cir. 1998). A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money. *See Daniel*, 329 F.3d at 485.

The indictment charged Jamieson with involvement in a multi-pronged conspiracy to defraud investors and insurance companies by trading in fraudulent life insurance policies and by making material misrepresentations as to the nature of the policies and the escrow services the investors would receive. On appeal, Jamieson does not challenge the sufficiency of the evidence regarding material misrepresentations that he made to investors, evidence that is itself sufficient to support a finding of fraud. Instead, Jamieson focuses his arguments on the government's proof as to whether the policies were fraudulent and whether Jamieson knew about the fraud. But contrary to Jamieson's assertions, the government produced more than sufficient evidence to support a finding that several hundred of the policies were fraudulent.

Five witnesses, including several of the viators, testified that they had sold or brokered the sales of anywhere from five to 72 fraudulent policies to Liberte Capital. Additionally, the government produced an expert who testified that, after analyzing a significant portion of the policies handled by Liberte Capital, she had found 214 she could identify as definitely fraudulent. A second government analyst testified that, in over 60 percent of the Liberte Capital policies, the viator's diagnosis date preceded the date the insurance policy was issued, thus indicating a high likelihood that the policy was fraudulently obtained.

The government also produced sufficient evidence to show that Jamieson knew that Liberte Capital was trading in fraudulent policies. One of the viators, Orren Rickets, testified that he had spoken with Jamieson about obtaining fraudulent policies for his AIDS-infected 12-year-old sister, in order to sell them to Liberte Capital. Additionally, a Liberte Capital employee admitted writing a note to Jamieson, on the top of a policy subsequently purchased by Liberte Capital, to the effect that the policy was fraudulent.

Evidence about Jamieson's own conduct provides further indication that Jamieson knew about and participated in the conspiracy to defraud. In a March 1998 meeting with Liberte Capital sales agents, Jamieson described how viators could obtain fraudulent policies and mentioned that these fraudulent policies were easy to distinguish. Then, in sworn testimony before the Ohio State

Department of Commerce in January 2000, Jamieson said  that Liberte Capital had never attempted to determine whether the policies they traded were fraudulent because he was "unaware that people were applying for life insurance fraudulently."  Finally, jurors heard evidence that, after learning about a federal investigation into fraudulent viatical schemes, Jamieson ordered his employees to destroy the policy application in each viator's file.  From all of this evidence, a reasonable juror could conclude that Jamieson knew about and participated in the conspiracy to defraud life insurance companies and investors by trading in fraudulent viaticals.

Jamieson also alleges that there is insufficient evidence to support his conviction on the 155 counts of money laundering, all of which charged violations of 18 U.S.C. §§ 1956 and 1957, based on proof of monetary transactions involving the proceeds of unlawful activity.  Jamieson does not dispute that the transactions took place or that their purpose was to promote or conceal but, rather, contends that the government failed to establish that the allegedly laundered funds were the "proceeds of some form of unlawful activity."  This argument relates to the same contention that Jamieson made with regard to his conviction for conspiracy to commit mail fraud.  As we noted above, that conviction was based on both the fraudulent insurance policies *and* his multiple misrepresentations to investors.  But just as he did with the conspiracy conviction, in challenging the money-laundering convictions Jamieson ignores the misrepresentation prong and states that "[o]nly the prong [of the conspiracy] alleging that insurance policies were fraudulently obtained serves as a predicate to the money laundering counts."  We disagree.

A review of the record indicates that the money-laundering counts do not rely solely on the fraudulent policies as their predicate.  For example, as to counts 2-81 the indictment charged that the money transactions involved property representing "the proceeds of some form of unlawful activity."  As to counts 82-157, the indictment alleged that the transactions involved the proceeds of or property derived from "a specified unlawful activity, that is, mail fraud in violation of [18 U.S.C. § 1341]."  Thus, the indictment does not define the predicate crime to the money laundering as relating specifically to the fraudulent policies or even as the mail fraud conspiracy described in count one.  Because the indictment does not define "unlawful activity" as a certain act or set of acts, we are not limited in what conduct we may consider to establish the underlying criminal activity.  *See United States v. Tencer*, 107 F.3d 1120, 1131 (5th Cir. 1997) (where the indictment does not define the specific mail fraud referred to, the money-laundering count may rely on evidence of any mail fraud, even if that mail fraud is not mentioned in the indictment).

Jamieson alleges that the evidence is insufficient to support the money-laundering charges because "the government performed no tracing of investor funds" to specific illegal acts, namely the 214 fraudulent policies.  This argument has no merit.  Counts 2-100 of the indictment charge Jamieson with money laundering under § 1956, and the circuits have almost unanimously held that § 1956 money-laundering charges do not require the government to trace the monies to specific unlawful activity.  *See United States v. Bencs*, 28 F.3d 555, 562 (6th Cir. 1994) (§ 1956 does not require that the government "trace the origin of all funds . . . to determine exactly which funds were used for what transaction"); *see also Tencer*, 107 F.3d at 1130-31; *United States v. Mankarious*, 151 F.3d 694, 701-03 (7th Cir. 1998); *United States v. Habhab*, 132 F.3d 410, 414 (8th Cir. 1997); *United States v. De La Mata*, 266 F.3d 1275, 1292 (11th Cir. 2001).  Indeed, several circuits have upheld a money-laundering conviction even when the underlying mail fraud conviction was overturned or the defendant was acquitted on the mail fraud count.  *See, e.g., Mankarious*, 151 F.3d at 703;  *Tencer*, 107 F.3d at 1130-31; *United States v. Kennedy*, 64 F.3d 1465, 1480 (10th Cir. 1995).  Additionally, not all of the money involved in the transactions must be derived from the unlawful activity.  *See Habhab*, 132 F.3d at 414.  When money from illegal sources is co-mingled with money from unspecified other sources, "all such funds are attributable to the money laundering scheme."  *United States v. Owens*, 159 F.3d 221, 229 (6th Cir. 1998).

In the case at hand, the government presented voluminous evidence that Jamieson committed mail fraud by making material misrepresentations to induce investors to buy policies and by dealing in fraudulently obtained insurance policies. All the money received from investors was put in an account with the escrow service and thus co-mingled. The government established that the monies used in each transaction listed in the indictment were investor funds that came from this tainted account. Hence, there is sufficient evidence to permit the jury to have found, beyond a reasonable doubt, that the financial transactions in counts 2-100 involved the proceeds of illegal activities.

Counts 101-157 of the indictment charge Jamieson with money laundering pursuant to 18 U.S.C. § 1957. Unlike with § 1956, there is some disagreement among the circuits about whether funds must be traced to support a conviction under § 1957. *Compare United States v. Richard*, 234 F.3d 763, 768 (1st Cir. 2000) (a § 1957 conviction "does not require proof that the defendant committed the specified predicate offense; it merely requires proof that the monetary transaction constituted the proceeds of a predicate offense" (internal citation omitted)) *with United States v. Rutgard*, 116 F.3d 1270, 1292 (9th Cir. 1997) (declining to follow other circuits which used the § 1956 precedent to eliminate any tracing of funds in § 1957 cases). The Sixth Circuit has never ruled on what the tracing requirements are for § 1957 money laundering, but the outcome of this case is the same regardless of whether tracing is required, because the government provided proof that Liberte Capital made material misrepresentations to all of its investors. As a result, the jurors heard evidence about misrepresentations regarding (1) the amount of money Jamieson would hold in escrow, (2) the independent nature of the escrow company, (3) the life expectancy of the viators, and (4) the fact that some of the policies were fraudulently obtained and thus subject to recision. The evidence pertaining to the breadth of these misrepresentations is sufficient for the jurors to have found that each and every investor was affected by the fraud and, thus, that all investor funds were proceeds of the illegal fraud scheme. As noted above, the government adequately proved that all of the money in the charged transactions came from investor funds. Thus, we conclude, the government sufficiently traced the money in the transactions to the underlying illegal mail fraud. As with his conviction for conspiracy to commit mail fraud, Jamison's § 1956 and § 1957 money-laundering convictions are adequately supported by the evidence.

## B. The Motion to Recuse

Jamieson alleges that the district court erred in denying his motion to recuse, citing 28 U.S.C. § 455(b)(1) and claiming that the district judge could not preside over his criminal trial because he had "personal knowledge of disputed evidentiary facts concerning the proceeding" gained from the fact that he was also handling a civil case against Jamieson. The civil action involved a receivership, into which recoveries in the criminal case would be deposited. Jamieson contends that from this participation in the civil case, the district judge gained "personal knowledge" of relevant disputed facts in the criminal case.

In order to justify recusal under 28 U.S.C. § 455, the judge's prejudice or bias must be personal or extrajudicial. *See United States v. Hartsel*, 199 F.3d 812, 820 (6th Cir. 1999). "'Personal' bias is prejudice that emanates from some source other than participation in the proceedings or prior contact with related cases." *Youn v. Track, Inc.*, 324 F.3d 409, 423 (6th Cir. 2003). Jamieson makes no allegation that the district judge in this case had knowledge resulting from any *extrajudicial* activities or exposure; all the information known by the judge came from his judicial involvement with related cases, not from any extrajudicial or personal sources. Furthermore, Jamieson does not "point to any specific facts [the district court] obtained from presiding over [the other cases] which would raise a question about his impartiality." *See Hartsel*, 199 F.3d at 820. Nor does Jamieson identify any rulings or actions during the criminal trial that indicate partiality or the use of "personal knowledge of disputed evidentiary facts" on the part of the district judge. In short, Jamieson has given us no reason to find that the district court abused its discretion in denying his motion to recuse.

## C.  Restraint of Assets

Jamieson next alleges that the district court violated his Sixth Amendment right to counsel of his choice by freezing his assets immediately following indictment, thereby preventing him from using his own assets to pay for his defense.  On appeal, Jamieson contends that the government failed to establish probable cause that the restrained assets were traceable to the offenses in the indictment, because the district court did not hold an adversarial hearing or otherwise require the government to prove traceability before granting the motion to freeze assets.

Although the Sixth Amendment grants a defendant the right to obtain counsel of his choice, this right "does not extend beyond the individual's right to spend his own legitimate, nonforfeitable assets."  *United States v. Farmer*, 274 F.3d 800, 802 (4th Cir. 2001) (citing *Caplin & Drysdale v. United States*, 491 U.S. 617, 624-33 (1989)).  The Supreme Court has held that a defendant's assets may be restrained prior to trial as long as they are restrained based on a finding of probable cause to believe that the assets are subject to forfeiture. *See United States v. Monsanto*, 491 U.S. 600, 615 (1989).  Under 21 U.S.C. § 853(e)(1), a court may enter a restraining order "upon the filing of an indictment or information charging a violation . . . for which criminal forfeiture may be ordered."

In this case, the indictment lists approximately $104 million as the amount involved in the money-laundering scheme and thus subject to forfeiture.  The grand jury found probable cause for all of the allegations listed in the indictment, including count 158, which charged Jamieson with conspiracy to commit money laundering involving $104 million.  The government has therefore made a basic showing of probable cause justifying restraint of Jamieson's assets.

On appeal, Jamieson's principal complaint is that the district court did not go beyond the allegations in the indictment and hold an adversarial hearing to determine whether there was probable cause to conclude that the assets were subject to forfeiture.  In *Monsanto*, 491 U.S. at 615, n. 10, the Supreme Court specifically refrained from ruling on whether due process requires such a probable cause hearing to support restraint of assets prior to trial or whether the indictment is sufficient.  Although we have never had the occasion to resolve this question in the Sixth Circuit, various other courts around the country have addressed it, with less than uniform results.[3]  The district court in this case followed the lead of the Tenth Circuit in *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998), in which the court noted that "an adversarial hearing that occurs shortly after freezing assets would serve to diminish the risk of an erroneous deprivation at a meaningful time" but held that such a hearing is necessary only when the defendant can (1) "demonstrate to the court's satisfaction that she has no assets" and (2) "make a prima facie showing of a bona fide reason to believe the grand jury erred in determining that the restrained assets 'constitute or are derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.'"  *Id.* at 646, 647.  When the defendant makes the required showings, the burden then shifts to the prosecution

---

[3]The Ninth Circuit, for example, has held that, prior to restraining assets in a criminal case, the district court must hold a hearing under Fed. R. Civ. P. 65 to determine whether probable cause exists to issue the restraining order. *See United States v. Roth*, 912 F.2d 1131, 1133 (9th Cir. 1990).  On the other end of the spectrum, the Eleventh Circuit never requires such a hearing, but rather has held that the trial itself satisfies all due process concerns regarding pre-trial seizure of funds. *See United States v. Register*, 182 F.3d 820, 835 (11th Cir. 1999).  Most circuits fall somewhere in between the Ninth and Eleventh Circuits and require that, in certain situations, the district court must hold a post-restraint adversarial hearing to determine probable cause to restrain the assets. *See United States v. Monsanto*, 924 F.2d 1186, 1203 (2nd Cir. 1991) (the Fifth and Sixth Amendments require a post-restraint, pretrial hearing regarding probable cause to restrain assets which are needed to retain counsel of choice); *United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998) (due process prohibits restraining funds without a hearing if the defendant can show a bona fide need to use the funds to obtain counsel); *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998) (due process requires an adversarial hearing if the defendant can both show she has no other assets with which to pay for counsel and make a prima facie demonstration of error in the grand jury's finding of probable cause); *United States v. Farmer*, 274 F.3d 800, 803 (4th Cir. 2001) (due process requires an adversarial hearing when defendant can show that he lacks other funds with which to secure counsel and that a portion of the restrained funds is legitimate).

to establish, by probable cause at an adversarial hearing, that the restrained assets are traceable to the underlying offense. *Id.* at 647. Jamieson did not object to or appeal the district court's decision to use the *Jones* framework and has never put forth any arguments that the *Jones* framework should not be applied to his case. In fact, Jamieson cites *Jones* in support of his argument on appeal, thus implicitly agreeing to its validity as precedent.

We have no quarrel with the district court's decision to apply *Jones*, recognizing as we do that "[a] fundamental requirement of due process is the 'opportunity to be heard.'" *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965), and that the opportunity to be heard is non-existent when a district court grants a restraining order based only on the indictment. Certainly, due process should be honored when a defendant's Sixth Amendment right to counsel of choice is threatened by virtue of the restraint of his funds. But the claimed violation of due process in this case is belied by the fact that the district court actually provided the defendant with an adversarial hearing and an opportunity to be heard.

The record indicates that in response to Jamieson's motion to dissolve the restraining order or to hold an adversarial hearing, the district court determined that Jamieson had not properly met either *Jones* prong. *See United States v. Jamieson*, 189 F. Supp. 2d 754, 757-58 (N.D. Ohio 2002). The district court nevertheless held a hearing for the limited purpose of having Jamieson make both a further showing of his need for the assets and a prima facie showing that the assets were erroneously restrained. Although the district court did not explicitly make any findings that Jamieson had met both *Jones* prongs after presenting additional evidence at the hearing, the court instructed the government to present its evidence regarding probable cause to believe the assets were subject to forfeiture. At the hearing, the government duly presented a witness who established that Jamieson had very few assets at the beginning of the indictment period and that Jamieson's profits from Liberte Capital were his only source of income during the indictment period. Based on this testimony, the trial court found probable cause "to believe that the restrained assets (i.e. the 'vacation' home primarily, although other assets were addressed, as was the restraining order itself) [were] in fact traceable to the underlying offenses, [were] thus 'tainted,' and [had] been properly the subject of a post-indictment restraining order."

Thus, the record shows that the district court heard live testimony regarding the restrained assets and that Jamieson had the chance to cross-examine the government's witness. On appeal, the defendant has presented no specific challenge to the sufficiency of the hearing that was held.

Moreover, with regard to the defendant's claim that he was denied the right to counsel of choice, any error on the part of the district court with regard to the order restraining assets would have to be considered harmless error, which has been held to apply to choice of counsel. *See Rodriguez v. Chandler*, 382 F.3d 670, 674 (7th Cir. 2004) ("It is hard to see why violations of the qualified right to counsel of choice should lead to automatic reversal, when deprivation of the absolute right to a competent attorney leads to relief only if prejudice is demonstrable."). Not only has Jamieson failed to allege prejudice, he has not even voiced dissatisfaction with his two trial attorneys. Indeed, he cannot show that he was deprived of counsel of his own choosing, because the record indicates that his primary court-appointed attorney was, in fact, his counsel of choice.

## D.  Failure to Provide Adequate Funds

Jamieson next contends that he was denied the effective assistance of counsel because of insufficient funding for his defense. An indigent defendant may request monies for investigative, expert, or other services under the Criminal Justice Act, 18 U.S.C. § 3006A. We have directed the district courts to authorize services under § 3006A "upon a demonstration that (1) such services are necessary to mount a plausible defense, and (2) without such authorization, the defendant's case

would be prejudiced." *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002). We review a district court's denial of authorization for abuse of discretion. *Id.* at 406.

Shortly after Jamieson was indicted, the trial court appointed two qualified defense attorneys to represent him. Jamieson alleges, however, that his attorneys did not receive the funds necessary to investigate the case against him and prepare an adequate defense. According to the district court, when Jamieson submitted his initial motion for funds, he requested $500,000 "without any budget or breakdown as to the utilization of those funds." The district court denied the motion because the amount was "beyond the scope of reasonably incurred expenses." At the suggestion of the district court, Jamieson later submitted a revised proposal, including a budget and an explanation of the services requested, asking for authorization of a more reasonable sum. Although the revised proposal was not submitted in a timely manner, the district court nevertheless authorized $100,000 for Jamieson's use. Through the use of these funds, Jamieson received the services of at least five experts, three of whom he selected to testify at trial. The district court noted that Jamieson also had the full-time assistance of a retired FBI special agent both before and during trial. Under these circumstances, we fail to find that the defendant has demonstrated prejudice arising from the district court's decision to limit funds for experts under § 3006A.

Nor do we find an abuse of discretion in the district court's denial of funds to purchase the forensic software necessary to access all documents contained on 64 disks produced by the government. Initially, the government gave Jamieson a set of 42 disks containing all the files lifted from Liberte Capital's computers. This first set of disks was readable without any special software. Later, the government developed a second set of 64 disks that included the materials from the original disks, plus deleted files and file fragments on the Liberte Capital computers. The only way to obtain access to the latter material was to use a special forensic program that, once used, rendered the disks unreadable without the use of extraordinarily expensive software. The district court worked with both counsel to find additional ways for Jamieson to obtain complete access to these files, but no solution was reached. The government cooperated with the court's efforts but, more importantly, assured the court that it had not relied on the deleted materials to build a case against the defendant, had not referred to them in drafting documentary exhibits, and would not use them in any way at trial. Additionally, Jamieson never demonstrated that the information on the disks was "necessary to a plausible defense" or that the inability to decode the disks would prejudice the case. Under these circumstances, we cannot conclude that the district court abused its discretion in denying Jamieson the funds to purchase the computer programs necessary to decode the disks.

## E. Admissibility of the Rule 1006 Summaries

Jamieson next challenges the district court's decision to admit the government's summary charts pursuant to Fed. R. Evid. 1006, claiming that introduction of the evidence in summary form violated his right to confrontation. Rule 1006 provides that:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place.

> We have held that Rule 1006 imposes five requirements for the admission of a summary: (1) the underlying documents must be so voluminous that they cannot be conveniently examined in court, (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place, (3) the underlying documents must be admissible in evidence, (4) the summary must be accurate and nonprejudicial, and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

*United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002) (internal citation omitted).   The admission of summaries into evidence "is a matter within the discretion of the district court, whose decisions in such matters will be upheld absent an abuse of discretion." *United States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998) (quoting *United States v. Williams*, 952 F.2d 1504 (6th Cir. 1991)) (internal quotations omitted).  Jamieson raises challenges to several different Rule 1006 exhibits put in evidence by the government.[4]  As to all of them, he alleges that the government failed to establish the second and third requirements as listed by *Modena*.[5]

Jamieson first contends that the government did not provide access to the summary charts and underlying documents sufficiently in advance of trial.  According to Rule 1006, the government must have "made the documents available for examination or copying at a reasonable time and place."  Because Rule 1006 operates independently of the discovery rules, the government had a duty to "'state when and where' the documents underlying its summaries could be viewed." *Modena*, 302 F.3d at 633 (quoting *Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 8 (1st Cir. 1996) ("to satisfy the 'made available' requirement, a party seeking to use a summary under Rule 1006 must identify its exhibits as such, provide a list or description of the documents supporting the exhibit, and state when and where they may be reviewed")).  In *Modena*, we held that merely making the records available upon request is insufficient. *Modena*, 302 F.3d at 633.[6]  Rule 1006 does not require, however, that the government provide Jamieson with a copy of the actual summary or send copies of the relevant documents to Jamieson.

Although Jamieson does not dispute that the government provided him with notice about its intended use of summaries, he argues that the notice was not specific enough because of the large volume of documents.  However, it is precisely because of the large volume that the government could not be more specific.  The summary introduced as government Exhibit 1-8, for example, gave information regarding the escrow rates used for 969 policies.  Information regarding each policy was relevant to the summary, so there was no way for the government to narrow down which of the 969 policy bid sheets Jamieson should have looked at.  Upon examination of the government's notices of its use of summaries, we conclude that the government was reasonably specific in identifying the underlying documents.

Jamieson also argues that the government did not give written notice of the summaries or provide access to the documents in a timely manner.  Our review of the record does not support this

---

[4] For ease of reference, these summaries will be identified by their exhibit numbers.  Jamieson raised challenges to 14 exhibits: 1-3, 1-5, 1-6, 1-7(A), 1-7(B), 1-8(A), 1-9(A), 1-9(B), 1-10(A), 1-10(B), 1-10(C), 1-11, 1-12(A) and 1-12(B).  Exhibits 10(A), (B), and (C), however, are not actually Rule 1006 summaries, but rather simply bound copies of Liberte Capital records.  Thus, 10(A), (B), and (C) do not need to be addressed pursuant to Jamieson's Rule 1006 complaints.

[5] Jamieson argues that the government was able to establish only the first requirement for admission, but he offers no arguments as to why requirements four and five were not established.  All of Jamieson's arguments go to the whether he had access to the information in a sufficient amount of time and whether the government adequately established that the underlying documents were admissible.  Due to the complete lack of discussion of the fourth and fifth requirements, we consider any objection based on those issues to be waived and will not address those issues. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

[6] Jamieson interprets *Modena* as requiring that the documents be made available *after* the summary has been provided.  But *Modena* does not appear to support this reading, because it does not indicate when the actual summary must be provided to the opposing party.  302 F.3d at 632-34.  Indeed, a party may not finish creating the summaries until near the start of trial, so limiting an opponent's access to the underlying records to the time *after* the summary is provided is illogical.

contention.[7]   Moreover, the purpose of requiring that the proponent of the summaries make the documents available is to "provide the opposing party . . . with an opportunity to prepare for cross-examination, or to offer exhibits of its own as rebuttal evidence." *Bray*, 139 F.3d at 1109. Jamieson conducted extensive cross-examination of the government's witnesses who prepared the summaries, and the record contains no indication that defense counsel was unable to challenge the validity of the summaries. Furthermore, at least one of the defense experts who testified against the summaries stated that, in forming his opinion, he had been able to review all the material that he thought was important. Jamieson has produced nothing more than mere speculation to support his allegation that he was prejudiced by not gaining earlier access to the documents underlying the summaries.

In addition to challenging the timeliness of his access to the documents, Jamieson argues that the documents underlying the summaries were hearsay and thus violated his Sixth Amendment right of confrontation. The district court found that the disputed evidence was admissible under the Rule 807 residual hearsay exception. When evidence is not admissible under Rules 803 and 804, it may still be admitted pursuant to Rule 807 if the evidence (1) has equivalent circumstantial guarantees of trustworthiness as evidence admitted under Rules 803 and 804; (2) goes to a material fact; and (3) is more probative than any other evidence that reasonably could have been procured. Finally, (4) the admission of the evidence must support the general purposes of the Rules of Evidence and the interests of justice. Fed. R. Evid. 807; *see also United States v. Darwich*, 337 F.3d 645, 658-59 (6th Cir. 2003). Jamieson argues that evidence admitted under Rule 807 cannot be used to support Rule 1006 summaries because Rule 807 is not a "firmly rooted" hearsay exception. We have held that all documents underlying a Rule 1006 summary must be admissible into evidence, but we have placed no further restrictions on the admissibility of the underlying documents. *See Martin v. Funtime, Inc.*, 964 F.2d 110, 116 (6th Cir. 1992). Thus, if evidence is admissible under Rule 807, it should also be appropriate material for a Rule 1006 summary. Jamieson has cited no authority suggesting that Rule 1006 documents must be limited to evidence admissible as non-hearsay or under "firmly rooted" hearsay exceptions.

In order to admit evidence under Rule 807, the district court must "consider the 'independent restrictions' on the admission of certain evidence contained in the Confrontation Clause of the Sixth Amendment". *Darwich*, 337 F.3d at 659. Hence, if underlying documents supporting a summary violate the Confrontation Clause, they are not properly admitted under Rule 807. Here, the Rule 807 evidence relied on by the government consisted of business records seized from Liberte Capital, files

---

[7] Summary 1-3 consists of information regarding the policies of all viators who sold over five policies to Liberte Capital. In addition to the summary, the underlying documents themselves, i.e., the files of the 32 viators, were also introduced into evidence as government Exhibits 1-1001 through 1-1033. On February 18, 2003, three months before trial began on May 21, 2003, the government filed its first Rule 1006 and Rule 807 notices, informing Jamieson of its intent to create a summary based on the 32 viator files. The notices state that "since May 2002, each individual document the government intends to introduce about each of these 32 viator-conspirators has been available for review in essentially trial ready form in eight boxes at the U.S. Attorney's Office." In the same February 18 notices, the government informed Jamieson of its intent to create a summary of the number of policies "with life expectancies beyond what Jamieson promised his investors" and identified the files to be used. This summary was eventually introduced as Exhibits 1-9(A) and (B).

Summaries 1-7 and 1-8, with all their sub-parts, show the premium escrow formula promised for each investor contract and the escrow formula that was actually used. On February 18, 2003, the government gave Jamieson notice that it would be summarizing policy bid sheets and stating that the bid sheets were available in both hard copy and electronic format. On March 27, 2003, the government updated its February notice with regard to 1-7 and 1-8 by specifically stating what information from the bid sheets would be used and adding a few additional sources for the information. The March 27 notice also gave Jamieson forewarning about Summary 1-12 and gave him access to the underlying documents. Summary 1-5 lists all of the policies for viators diagnosed with HIV or AIDS and compares the diagnosis date with the policy issuance date. On March 28, 2003, Jamieson received notice of this summary and a description of the underlying documents. The last summary the government notified Jamieson about was exhibit 1-11, a one-page summary of all documented payments Liberte Capital made with investor funds. Jamieson received the notification of Summary 1-11 on April 16, 2003, over a month before trial began.

taken from Liberte Capital's computers, viators' insurance policies and applications,[8] and medical records of the viators. In its recent opinion *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004), the Supreme Court noted that *testimonial* hearsay is the primary object of the Confrontation Clause. The Court further noted that testimony consists of "a solemn declaration or affirmation made for the purpose of establishing or proving some fact," and that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark" does not. *Id.* at 51. All of the Rule 807 evidence at issue here appears to be, essentially, in the form of business records. The evidence does not resemble the "formal statement" or "solemn declaration" identified as testimony by the Supreme Court.

Although Jamieson may have wished for more time to review the government's summaries and more specificity with regard to the underlying documents, he has identified no actual error. The district court therefore did not abuse its discretion in admitting the government's Rule 1006 summaries into evidence.

## F. Motion to Change Venue

Jamieson next alleges that, in light of the pretrial publicity, the district court's refusal to transfer the trial to another district deprived him of a fair trial. Jamieson made repeated motions to change the venue, all of which were denied by the district court. When the defendant makes such a motion, the trial court must transfer the case if "the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). We review the lower court's refusal to change the venue for abuse of discretion. *See United States v. Chambers*, 944 F.2d 1253, 1262 (6th Cir. 1991) (superseded on other grounds by statute).

Unsurprisingly, given the amount of money and number of investors involved, there appears to have been significant media coverage of this case. The record reveals multiple newspaper articles published by the Toledo Blade and other regional newspapers. Most of the articles were published prior to May 2002, well over a year before Jamieson's trial began in June 2003. A few additional articles appeared shortly before jury selection, including one on the day of jury selection, entitled "Trial to Open for Local Man Charged in $105M Fraud." The majority of the articles mention the charges against Jamieson and his co-defendants, predominantly James Capwill, and discuss the plight of the many investors who lost the money they invested through Liberte Capital. Many of the articles also state that Jamieson pleaded not guilty and describe his lawyers vigorously defending him. After examining the articles in the record, we agree with the district court's conclusion that, although some of the articles were "unflattering" to Jamieson, they presented a fair and balanced portrayal of events.

Jamieson also argues that he was denied a fair trial because "many of the prospective jurors" had been exposed to pretrial publicity. To satisfy due process concerns, however, it is not necessary for the jury to be totally ignorant of the case or to be wholly free from any exposure to pretrial publicity. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A juror's exposure to pretrial publicity "does not presumptively establish that the defendant was denied a fair trial." *Chambers*, 944 F.2d at 1262. The Supreme Court has found that "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. The trial judge conducted extensive individual voir dire to establish that the sitting jurors could render an unbiased verdict, and he imposed no time limits upon counsels' examination of the panel. Indeed, Jamieson has made no allegations that any actual prejudice occurred and has not identified

---

[8]The government was forced to obtain the viators' insurance policies and applications from the insurance companies because Liberte Capital had destroyed their own copies of the viators' applications.

any jurors who should not have been on the jury. We have held that "any party who claims to have suffered injustice must sustain that claim not as a matter of speculation, but as a demonstrable reality." *Kelly v. Withrow*, 25 F.3d 363, 368 (6th Cir. 1994) (quotations omitted) (finding no abuse of discretion in the district court's denial of change of venue). Jamieson has failed to show actual prejudice resulting from the district court's denial of his motion to change venue.

In some cases, the pretrial publicity is so great that prejudice is presumed. *See Chambers*, 944 F.2d at 1262 (citing *Rideau v. Louisiana*, 373 U.S. 723 (1963)). The Supreme Court has found publicity inherently prejudicial when "the influence of the news media . . . pervaded the proceedings" to the point that the trial was "conducted in a circus atmosphere." *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975) (referring to *Rideau*, 373 U.S. 723 (1963); *Sheppard v. Maxwell*, 384 U.S. 333 (1966); and *Estes v. Texas*, 381 U.S. 532 (1965)). The publicity surrounding Jamieson's case does not rise to the level of a "circus" atmosphere. First of all, the publicity was not pervasive; less than one-third of the prospective jurors admitted any exposure to the pretrial publicity. Secondly, the media's treatment of the case was not unduly one-sided or unfair. The district court correctly determined that the articles were "not of such an inflammatory nature as to elevate them to the level of presumed prejudice." We conclude that the trial court did not abuse its discretion in refusing to transfer the case or that Jamieson's right to a fair trial was infringed upon by denial of his motion to transfer.

## G. Prosecutorial Misconduct

Jamieson alleges multiple incidences of prosecutorial misconduct in the government's closing argument, contending that the prosecutor inappropriately denigrated defense counsel and argued several matters that were not in evidence. We use a two-part test when reviewing a claim of prosecutorial misconduct. First, we must determine whether the remarks were indeed improper and, second, if the remarks were improper, whether they were flagrant enough to warrant reversal. *See United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003). Even if the improper remarks are not considered flagrant, we will reverse a conviction upon a finding that "1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) (citing *United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979)).

Jamieson first argues that the prosecutor mischaracterized the testimony of Orren Ricketts. However, our review of Ricketts's testimony indicates that the government accurately summarized his statements. The fact that Jamieson did not find Ricketts's testimony convincing does not mean that the government may not utilize the testimony in closing argument. Similarly, Jamieson maintains that there was no evidence in the record to support the government's statements indicating that the majority of the investors were elderly or retired. But jurors heard at least two sales agent testify that all of their investment customers were either retired or over 65. A third salesman and investment advisor testified that the Liberte Capital viaticals were particularly appropriate for elderly investors because of the guarantees in the contract and brochure.

Jamieson next alleges that the government made improper references to investor losses during the closing argument, because the defense had not been "permitted to inquire into investor losses during cross examination nor address it during the course of the trial." On the contrary, defense counsel had the opportunity to cross-examine five government witnesses regarding loss caused by insurance companies' recision of policies. In addition, two defense witnesses discussed the recisions. Given the minimal and unspecific nature of the government's references to loss in its closing statement and the fact that loss was alluded to throughout the trial, we cannot agree that the government's statements were improper.

Finally, Jamieson claims that the prosecutor personally attacked defense counsel's integrity. Of course, a prosecutor should not directly or implicitly impugn the integrity or institutional role of defense counsel. *See United States v. Bennett*, 75 F.3d 40, 46 (1st Cir. 1996). In challenging the credibility of one of Jamieson's expert witness, the government attorney stated:

> The only evidence that's contrary to any of this . . . comes from . . . Mr. Thullen, the witness that [defense counsel] had used in three earlier cases, although she didn't want you to know that. He didn't want you to know that.

The government's statement referred to the fact that neither defense counsel nor the witness brought up the fact that the witness had previously testified for defense counsel. In evaluating whether a statement rises to the level of misconduct, "it is necessary to view the conduct at issue within the context of the trial as a whole." *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004). The statement at issue in this case was made in the context of a list of reasons why the witness was not credible. Although the prosecutor's reference to defense counsel may reflect poor judgment, it was an isolated incident and was buried within legitimate and supported attacks on the witness's credibility. Moreover, because defense counsel did not object to the government's statement, seek an admonition from the court, or request a mistrial, we cannot reverse based on misconduct unless the statement was flagrantly improper. *See Francis*, 170 F.3d at 549-50. Certainly, it did not rise to that level in this case.

## H. Jury Instructions

Jamieson next appeals based on two instructions the district court refused to deliver to the jury. "Trial courts have broad discretion in drafting jury instructions," and thus we will review the instructions only for abuse of discretion. *United States v. Prince*, 214 F.3d 740, 761 (6th Cir. 2000). Moreover, rather than examining a single instruction in isolation, we are required to examine the instructions in their entirety to determine whether "the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *United States v. Pensyl*, 387 F.3d 456, 458 (6th Cir. 2004) (quotations omitted). "This court may reverse a judgment based on an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999) (quotations omitted). We have also held that a district court's refusal to deliver a specific instruction warrants reversal only if "that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Daniel*, 329 F.3d at 489-90 (quotations omitted). Furthermore, "an omitted or incomplete instruction is . . . less likely to justify reversal [than an improper instruction], since such an instruction is not as prejudicial as a misstatement of the law." *United States v. Hook*, 781 F.2d 1166, 1173 (6th Cir. 1986) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

Jamieson claims that the trial court should have charged the jury that he "owed no duty of disclosure to the individual investors . . . except to the extent that the government has proven beyond a reasonable doubt that the defendant had a relationship of trust and confidence with an investors [sic]." Arguing that the duty to disclose is relevant where the fraudulent misrepresentation was by omission rather than by an affirmative statement, Jamieson argues that the government established only misrepresentation by omission. The trial court instructed the jury that "[a] statement may also be false or fraudulent when it constitutes a half truth, or when it effectively conceals a material fact, with intent to defraud." We conclude that this instruction adequately guards against the jury finding that a simple omission, independent of any other statements encouraging trust and confidence in the defendant, can constitute fraud.

Even if the trial court's refusal to give the "duty to disclose" instruction was error, the error must be considered harmless. Contrary to Jamieson's assertion, the government presented significant evidence that the defendant made affirmative material misrepresentations. As discussed in above, the government established that Jamieson made affirmative misrepresentations regarding the nature of the insurance policies, the amount of money to be held in escrow, and the independent nature of the escrow service. The jury could have convicted Jamieson even without finding any fraudulent omissions, and thus any possible error in the instructions regarding fraudulent omissions cannot be considered prejudicial.

Jamieson also argues that the district court erred in failing to give an instruction that a mail fraud scheme must be "reasonably calculated to deceive persons of average prudence." It is well-established in this circuit that a scheme to defraud, as prohibited by the mail fraud statute, "must involve misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Berent v. Kemper Corp.*, 973 F.2d 1291, 1294 (6th Cir. 1992) (quoting *Walters v. First Tennessee Bank*, 855 F.2d 267, 273 (6th Cir. 1988)). The government argues that the "ordinary prudence and comprehension" modifier is necessary only to prevent criminalization of mere sales puffery. In support of its argument, the government cites *Neder v. United States*, 527 U.S. 1, 24-25 (1999), in which the Supreme Court noted that "[t]he common law requirements of 'justifiable reliance' and 'damages' . . . plainly have no place in the federal fraud statutes." The Supreme Court's rejection of "justifiable reliance" focused, however, on *actual* reliance, not whether the scheme is *worthy* of reliance, as reflected by the Court's citation to a Tenth Circuit holding that the government need not prove "actual reliance." *Id.* at 25 (citing *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989)). Furthermore, in explaining its rationale for not requiring "justifiable reliance," the Court stated, "By prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted." *Neder*, 527 U.S. at 25. A plain reading of *Neder* thus indicates that the Supreme Court did not intend to remove the requirement that misrepresentations be worthy of reliance or credence. *See Daniel*, 329 F.3d at 486 (interpreting the relevant statement in *Neder* as an explicit rejection of "the argument that a materiality requirement included a reliance requirement"); *see also United States v. Welch*, 327 F.3d 1081, 1106 (10th Cir. 2003) (requiring that a scheme be reasonably calculated to deceive persons of ordinary prudence or comprehension is not inconsistent with *Neder*'s rejection of the "justified reliance" element). We do not read *Neder* to indicate that we must change the requirement in this circuit that a mail fraud scheme be credible enough to "deceive persons of ordinary prudence and comprehension." Thus, the better practice would have been to include a relevant instruction in the jury charge in this case.

The district court's refusal to instruct the jury on reasonable reliance does not warrant reversal of Jamieson's case, however, because the omission, when taken in context of the entire jury charge, was not confusing, misleading, or prejudicial. *See Harrod*, 168 F.3d at 892. In addition, the reasonable reliance charge was "substantially covered by the charge actually delivered to the jury." *Daniel*, 329 F.3d at 489 (quoting *United States v. Mack*, 159 F.3d 208, 218 (6th Cir. 1998)). In instructing the jury on the materiality requirement, the district court explained that the misrepresentation must have "had the potential or capability" to influence the action of or be relied upon by the investors. As the Eleventh Circuit has noted, "the elements of reasonable reliance and materiality analytically overlap [in that] both concern the expected effectiveness of the misrepresentations." *United States v. Yeager*, 331 F.3d 1216, 1221 (11th Cir. 2003). By explaining that the scheme must have had the potential to cause reliance, the trial court substantially covered the purpose of the "prudence and comprehension" requirement: to ensure that the scheme was at least minimally credible.

Furthermore, any error on the part of the trial court with regard to the "prudence and comprehension" instruction was, at most, harmless error. The government produced extensive and compelling evidence that Jamieson made material misrepresentations regarding relevant aspects of

Liberte Capital's business, such as the nature of the policies and Jamieson's relationship with the escrow group, for which an average investor would not have been able to check the validity or accuracy.    In addition, the fact that more than 2,000 investors believed Jamieson's misrepresentations and invested with Liberte Capital indicates that Jamieson's scheme was effective enough to "deceive persons of ordinary prudence and comprehension."    We find it totally improbable that the trial court's refusal to instruct the jury on "prudence and comprehension" materially affected the verdict.  Additionally, Jamieson's defense rested on the argument that he did not make misrepresentations, not that the misrepresentations were not credible.  As such, we conclude that the lack of a jury instruction regarding the reasonableness of reliance did not prejudice Jamieson's ability to present his defense.  *See Yeager*, 331 F.3d at 1223-24 (failure of the district court to inform the jury of the reasonable reliance element was harmless error where the error did not prejudice defendant's ability to present his defense).

## I.  The Sentence under *Booker*

In accordance with the Sentencing Guidelines, the district court sentenced Jamieson to 240 months of incarceration.  In addition to receiving a prison sentence, Jamieson was ordered to pay restitution in the amount of $92,120,491.  The defendant now appeals both his sentence of incarceration and the order of restitution.

Regarding the length of incarceration, Jamieson alleges that the trial court improperly applied several enhancements under the Sentencing Guidelines.  Jamieson's base offense level was increased by 18 points due to the court's finding that he caused a loss of approximately $92 million.  The trial court further increased his base offense level by two points due to the high number of victims, four points because the victims were especially vulnerable, four points because Jamieson played a leadership roll in the conspiracy, and two points for obstruction of justice.  Jamieson now appeals all the enhancements.

Over a year after Jamieson was sentenced, the Supreme Court issued its opinion in *United States v. Booker*, 125 S. Ct. 738 (2005), which held that sentence enhancements based on "judge-found facts" were unconstitutional.  The opinion also rendered the Sentencing Guidelines advisory rather than mandatory.  In light of *Booker*, we conclude that Jamieson was sentenced in violation of the Sixth Amendment and vacate his sentence, remanding his case to the district court for re-sentencing in a manner consistent with *Booker*.  As the *Booker* court explained, however, the district court must take the recommended guidelines into account when re-sentencing Jamieson. *See United States v. Hazelwood*, 398 F.3d 792, 800-01 (6th Cir. 2005).  Thus, it is proper for us to take this opportunity briefly to address the interpretation of the guidelines as applicable to the issues raised by the defendant. *See United States v. Barnett*, 398 F.3d 516, 529 (6th Cir. 2005).

The district court applied an 18-level increase to Jamieson's base offense level as a result of the amount of loss caused by Jamieson's crime pursuant to U.S.S.G. § 2F1.1(b)(1)(S).[9]  The presentence report found that Jamieson caused approximately $92,120,491.00 worth of loss through his conspiracy to commit mail fraud.  The defendant argues that the government never made a calculation of "losses" and, thus, that there is insufficient evidence to support the district court's finding.  The government's witness admitted that he had never calculated actual losses, but explained that he calculated all payments Liberte Capital made, other than to investors, which came from investor funds.  Jamieson asserts that this amount is not the equivalent of losses because the government's calculations did not include an account of the funds that were eventually returned to investors.

---

[9]U.S.S.G. § 2F1.1 has since been removed from the Guidelines, but Jamieson's sentence is based on the November 1, 1998 version of the Guidelines. (JA 5781)

The funds returned to investors, however, are relevant for a calculation of *actual* losses, not *intended* losses.  U.S.S.G. § 2F1.1 applies to loss that is either actual or intended.  *See United States v. Wade*, 266 F.3d 574, 586 (6th Cir. 2001).  Thus, the fact that the government's calculations do not represent a formal loss calculation does not preclude the district court's finding of $92 million in intended loss.

Jamieson also argues that, in his forfeiture hearing, the jury rendered a special verdict finding, by a preponderance of the evidence, that only $28 million was traceable to Jamieson's money laundering crimes.  The forfeiture hearing, however, related only to the money-laundering charges, and not the charge of conspiracy to commit mail fraud.  Thus, while the district court may choose to take the forfeiture verdict into account as evidence of loss from the conspiracy charge, it is not required to do so.

Jamieson next challenges the district court's applications of enhancements for the number of victims involved, the vulnerable nature of the victims, and the defendant's leadership role in the conspiracy.  Jamieson's objections to each of these enhancements, however, rest on the district court's findings of fact, not the court's interpretation of the guidelines or other issues of law.  Thus, the proper course for us to follow regarding these enhancements is to "allow the parties to argue for the exercise of the district court's discretion as authorized by *Booker*."  *United States v. Hines*, 398 F.3d 713, 722 (6th Cir. 2005).

Jamieson raises an issue of law with his challenge to the district court's two-point enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.  He alleges that the district court improperly based the enhancement on conduct that is outside the temporal scope of § 3C1.1.  The district court applied the § 3C1.1 enhancement after crediting the government's evidence that Jamieson shredded all the insurance policies in Liberte Capital's files after he learned that another viatical broker was being investigated.  As Jamieson argues, the enhancement should not be applied unless the obstructive behavior occurred either during or shortly preceding the investigation.  An enhancement is warranted under § 3C1.1 when the defendant willfully obstructs "the administration of justice *during the course of* the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1 (emphasis added).  The Application Notes for § 3C1.1, which give guidance on how to apply the enhancement, give as an example of obstructing justice, "shredding a document or destroying ledgers upon learning that an official investigation has commenced *or is about to commence*." Application Note 4(d) (emphasis added).  Jamieson's destruction of the documents in this case occurred sometime in 1998 or early 1999, but the government's evidence does not establish a firm date.  A federal agent informed Jamieson that he was under investigation in May of 1999.  Based on the language of the guidelines,  it is not enough for the district court to find that Jamieson destroyed the documents in anticipation of a possible future investigation; Jamieson must have known about his imminent investigation. The government's evidence does not establish a date of the destruction with any specificity, and the government does not allege that Jamieson knew about the investigation into Liberte Capital until May 1999 or that the investigation was ongoing at the time the documents were destroyed.  Because the evidence does not indicate that Jamieson knew about his imminent investigation when he destroyed the documents, the destruction cannot be considered an obstruction of justice for the purposes of § 3C1.1.

Finally, Jamieson argues that the district court erred in ordering him to pay restitution in the amount of $92,120,491.00 pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. Jamieson's crime of conspiracy to commit mail fraud falls under the Act, and thus the district court is required to order restitution.  The "loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order."  *Hughey v. United States*, 495 U.S. 411, 420 (1990).  Section 3663A(a)(2) specifically provides that Jamieson can only be ordered to pay restitution to victims "directly harmed by [his] criminal conduct in the course of the . . . conspiracy."

In addition to arguing that there was insufficient evidence to support a finding of $92 million in losses, Jamieson alleges that the amount is not properly tied to Jamieson's actions in furtherance of the conspiracy. This claim is without merit because, as discussed above, the government presented evidence indicating that Jamieson was associated with every aspect of the conspiracy and that substantially all of the investors were subjected to Jamieson's fraudulent misrepresentations. Because the Sixth Circuit has recently concluded "that *Booker* does not apply to restitution," this portion of Jamieson's sentence is affirmed. *United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005).

## III. *CONCLUSION*

For the reasons set out above, we AFFIRM Jamieson's conviction on all 157 counts but VACATE the district court's sentencing order and REMAND the case for re-sentencing in accordance with *Booker*.