NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0445n.06

Case No. 17-6281

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 28, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DANIEL R. GOODWIN, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: BOGGS, CLAY, and ROGERS, Circuit Judges.

CLAY, Circuit Judge. Daniel Goodwin ("Goodwin") appeals from the judgment entered by the district court sentencing him to eighteen months in prison and two years of supervised release, and ordering him to pay $1,320,000 in restitution after being convicted of wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. On appeal, Goodwin raises a sufficiency of the evidence challenge. For the reasons set forth below, we **AFFIRM** the decision of the district court.

## BACKGROUND

### I. Factual History

In 2008, David Bennett ("Bennett") met with the then-Mayor of Manchester, Kentucky, Carmen Lewis ("Lewis"), to discuss developing a green park, or recycling facility, in the area. After Bennett advised that he had selected Manchester as the location for the park, the city of

Manchester purchased land for the park and contracted with a development firm to begin working on a design.

Bennett also began lining up several contractors to work on the park, including Elza Construction, LLC ("Elza Construction"). In October 2009, Elza Construction agreed to perform excavation and grading work on the site in exchange for $44,000,000. In lieu of a performance bond, Elza Construction agreed to put up $1,320,000 to ensure completion of the work. Their agreement provided that Elza Construction would deposit the money into The Goodwin Law Firm Legal Trust Account. The agreement provided that The Goodwin Law Firm would release the funds to USA Global Holdings Business Trust ("USA Global") "for it to leverage the Funds by purchasing various financial instruments." (Gov't Appendix, Exhibit 7, at 15.) The agreement provided that Elza Construction would be refunded the $1,320,000 within 105 days of its payment. The agreement also provided that if USA Global were unable to "fund the Loan in accordance with the draw schedule," it would "immediately" return the funds to The Goodwin Law Firm for it to "immediately" return the funds to Elza Construction. (*Id*. at 16.)

Four companies were party to the agreement: The Goodwin Law Firm, USA Global, Elza Construction, and Global Green Holdings, LLC ("Global Green"). Goodwin ran The Goodwin Law Firm and was also independent counsel for USA Global. Sidney Tarrant ("Tarrant") and Izhar Syed ("Syed") were trustees for USA Global. Bennett was the manager of Global Green. Goodwin signed the agreement on behalf of The Goodwin Law Firm as managing member. Tarrant signed on behalf of USA Global as a trustee. Paul Elza signed on behalf of Elza Construction as owner. Bennett signed on behalf of Global Green as manager.

Shortly after signing the agreement, Elza Construction wired the money to The Goodwin Law Firm Legal Trust Account. Of the $1,320,000, Goodwin transferred $530,613.59 to USA Global. Goodwin transferred the rest to other accounts.

Despite completing some site preparation work and incurring significant costs, Elza Construction never received any of the $44,000,000 promised for the work. Elza Construction also never received any of its $1,320,000 back. The green park has never been built.

## II.    Procedural History

On August 28, 2014, the government indicted Goodwin, Bennett, Tarrant, and Syed on five counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371.[1] Before trial, the government moved to dismiss the fourth wire fraud count against Goodwin. The court granted that motion on the first day of trial.

A seven-day jury trial was held from January 31, 2017 to February 8, 2017. Goodwin orally moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case and renewed his motion at the close of his own case. The court denied both motions. The jury found Goodwin guilty of four counts of wire fraud and one count of conspiracy to commit wire fraud on February 9, 2017.

Goodwin filed a motion for judgment of acquittal or in the alternative a motion for a new trial, arguing that the government failed to present sufficient evidence of wire fraud or conspiracy. The district court denied Goodwin's motion and concluded that "a rational trier of fact could infer Goodwin committed the crimes he was charged with beyond a reasonable doubt." (R. 244, Opinion, PageID # 2451.)

---

[1] Bennett pleaded guilty to conspiracy to commit wire fraud and was sentenced to thirty-seven months in prison. Syed pleaded guilty to conspiracy to commit wire fraud and was sentenced to eight months in prison. The government has been unable to find Tarrant. Apparently, he is somewhere in Africa.

The court sentenced Goodwin to eighteen months in prison and two years of supervised release, and ordered him to pay $1,320,000 in restitution.[2]  Goodwin appealed and argues that there was no evidence that would permit a rational trier of fact to conclude that he committed wire fraud or conspired to commit wire fraud.

**DISCUSSION**

**I.       Sufficiency of the Evidence**

**Standard of Review**

This Court reviews a district court's denial of a motion for judgment of acquittal *de novo*. *United States v. Osborne*, 886 F.3d 604, 607–08 (6th Cir. 2018).  When considering a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "All reasonable inferences and resolutions of credibility are made in the jury's favor." *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013) (quoting *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012)).  "A convicted defendant bears 'a very heavy burden' to show that the government's evidence was insufficient." *Id*. (quoting *United States v. Kernell*, 667 F.3d 746, 756 (6th Cir. 2012)).  "We may not 'weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury.'" *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (quoting *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588–89 (6th Cir. 1999)).  "We will reverse a conviction 'only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence.'" *United States v. Wright*, 774

---

[2] This is a joint and several obligation with his co-defendants for the full amount.

F.3d 1085, 1088 (6th Cir. 2014) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)).

**Analysis**

**A.     Wire Fraud**

Under 18 U.S.C. § 1343:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned . . . or both.

"The statute requires proof of three elements." *United States v. Faulkenberry*, 614 F.3d 573, 580 (6th Cir. 2010). First, the defendant "devised or willfully participated in a scheme to defraud." *Id*. at 581. Second, the defendant "used or caused to be used an interstate wire communication in furtherance of the scheme." *Id*. (citation and quotation marks omitted). Third, the defendant intended "to deprive a victim of money or property." *Id*. (citation omitted).

On appeal, Goodwin principally challenges the first and third elements—that the government failed to prove that Goodwin knowingly and willfully participated in the scheme to defraud and that Goodwin had the requisite intent to defraud.

Under the first element, "[a] scheme to defraud is 'any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money.'" *United States v. Smith*, 749 F.3d 465, 477 (6th Cir. 2014) (quoting *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005)). "[A] scheme to defraud is a relatively broad concept, encompassing pretenses, representations, or promises that are either 'deceptive' or 'false.'" *Id*.

Under the third element, "the government must prove specific intent, which means 'not only that a defendant must knowingly make a material misrepresentation or knowingly omit a material fact, but also that the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission.'" *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003) (quoting *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)). "It is sufficient that the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken." *Id.* at 488. And a "defendant acts with fraudulent intent . . . whenever he means to deprive investors of their money—even if only in the short term." *United States v. Carpenter*, 676 F. App'x 397, 401 (6th Cir. 2017) (citation and quotation marks omitted). Because it is difficult to prove intent to defraud from direct evidence, "specific intent to defraud may be established by circumstantial evidence and by inferences [therefrom]." *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) (quoting *United States v. Yoon*, 128 F.3d 515, 523–24 (7th Cir. 1997)). "Intent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (citation omitted). "It must also be borne in mind that the question of intent is generally considered to be one of fact to be resolved by the trier of the facts and the determination thereof should not be lightly overturned." *Daniel*, 329 F.3d at 487 (alteration omitted) (quoting *United States v. Hopkins*, 357 F.2d 14, 18 (6th Cir. 1966)).

Keeping in mind Goodwin's heavy burden, we review the relevant evidence adduced at trial. First, the government produced evidence of a scheme. That scheme began after Bennett proposed a project in Manchester, Kentucky to develop a green park. Bennett convinced several contractors to sign on to do work for the park. One of those contractors was Elza Construction.

In October 2009, Paul Elza, the owner of Elza Construction, and his sons met with Bennett to discuss performing the excavation and grading work for the site. Typically, a contractor would put up a performance bond to ensure that all the work would be completed. But Elza Construction could not afford the performance bond on a project of this magnitude. Bennett knew that Elza Construction would not be able to put up that bond but told the Elzas that Global Green wanted to help a small contractor. To solve the problem, Bennett offered an alternative arrangement. Under that arrangement, and in lieu of a performance bond, Elza Construction would pay $1,320,000 into an escrow account. The funds would then be transferred to USA Global and used to release project financing that Bennett represented was already in place.

On October 6, 2009, to effectuate this arrangement, Bennett, on behalf of Global Green, and Paul Elza, on behalf of Elza Construction, executed a "Memorandum of Understanding" ("MOU"). (R. 199, Trial Tr., PageID # 922.) The MOU stated that "GGH has developed a certain relationship with the USA Global Business Holdings Trust (The Trust) wherein GGH can obtain the necessary financial assurance in lieu of conventional performance bonding as needed by Elza." (*Id*. at # 924.) The parties agreed that Elza Construction would receive $44,000,000 for its work on the green park. The MOU provided that the $1,320,000 would be wired to The Goodwin law Firm Legal Trust Account. The MOU provided that the "deposit funds will be returned to Elza" with 30% within 45 days of the escrow deposit to the account, with another 30% within 75 days, and with another 40% within 105 days. (*Id*. at # 926.)

The parties also executed an additional agreement concerning the $1,320,000 payment on October 6, 2009. This "Agreement" was between USA Global, The Goodwin Law Firm, Global Green, and Elza Construction. (Gov't Appendix, Exhibit 7, at 15.) The Agreement again provided that Elza Construction would receive $44,000,000 for its work, and that the company would

provide $1,320,000 up front "to support the various contracts of the transactions and to serve as a collateral position for the transaction." (*Id*. at 14.) It also provided for the return of the funds within 105 days of the deposit. Under the Agreement, The Goodwin Law Firm agreed to "hold and disburse the Funds from the Legal Trust Account in accordance with the terms and conditions of this Agreement and The Goodwin Law Firm, PLLC has agreed to do so act." (*Id*. at 15.) Those terms included:

> Upon confirmation of the receipt of the funds into the Legal Trust Account and upon The Goodwin Law Firm, PLLC obtaining sufficient verification of the legitimacy of the Funds, *The Goodwin Law Firm, PLLC shall release the Funds from the Legal Trust Account to USA Global Trust for it to leverage the Funds by purchasing various financial instruments*. The purpose of purchasing various financial instruments is designed to generate the funds necessary to permit USA Global Trust to fund the construction/management costs for the benefit of GGH for the purpose of funding the Project. . . . The Goodwin Law Firm, PLLC is simply acting in an escrow agent capacity. . . . *[I]f for any reason USA Global Trust is unable to fund the Loan in accordance with the draw schedule stated in the Transaction Summary attached hereto and incorporated herein by reference, it will immediately return the Funds to The Goodwin Law Firm, PLLC for it to then immediately return the Funds to ELZA.*

(*Id*. at 15–16 (emphasis added).) Goodwin signed on behalf of The Goodwin Law Firm.[3] Tarrant signed on behalf of USA Global. Paul Elza signed on behalf of Elza Construction. Bennett signed on behalf of Global Green.

On October 8, 2009, Elza Construction wired the $1,320,000 to The Goodwin Law Firm. This transaction was completed in two wires, one for $1,000,000 and another for $320,000.[4]

Under the terms of the Agreement, after receiving the $1,320,000 from Elza Construction into The Goodwin Law Firm Legal Trust Account, Goodwin was supposed to send the full amount

---

[3] Goodwin signed in his capacity as escrow agent, and not as counsel to USA Global.

[4] These separate wires form the bases of the first two counts of wire fraud with which Goodwin was charged.

to USA Global. And once with USA Global, the full amount was to be used to purchase financial instruments. After 45 days, Elza Construction was supposed to receive $396,000 (or 30% of the full amount) back. After 75 days, Elza Construction was supposed to receive another $396,000 (or 30% of the full amount) back. After 105 days, Elza Construction was supposed to receive $528,000 (or 40% of the full amount) back. By that point, Elza Construction should have received all of its $1,320,000 back.

The government produced testimony from numerous people who agreed with this understanding of the contract—that Goodwin was only permitted to send the $1,320,000 to USA Global and that he had no discretion to send it anywhere else. Further, Paul Elza testified that he would not have signed the Agreement if he had known that he would not have received the $1.32 million back within 105 days.

The government also produced the testimony of people who spoke about the duties of an escrow agent. For instance, Special Agent Matthew Holskey testified that an escrow agent is someone in a fiduciary capacity who "agrees to hold and [disburse] the funds in accordance with the contract" of the parties. (R. 199, Trial Tr., PageID # 934.) William Scott Creasman, former outside counsel for Global Green, testified that he had never paid his own legal bills out of a client escrow account, and that if a lawyer were going to get paid out of an escrow account, all the parties would have to sign off on it. Creasman testified that he saw no such term in the Agreement made with Elza Construction, or any of the other contractors. Even though Creasman also worked on the transaction, he billed his client separately. Syed testified that Goodwin was supposed to be managing the $1.32 million and making sure it was being utilized properly, which would mean going to finance an instrument. He also testified that escrow agents should never pay themselves out of an escrow account.

After receiving the $1,320,000 from Elza Construction into The Goodwin Law Firm Trust Account, Goodwin distributed the funds contrary to the Agreement. On October 9, 2009, Goodwin sent $300,000 to Global Green and $270,000 to Nevada Asset and Property Management, a company affiliated with Tarrant. These transfers were labeled bond fees.[5] Also, on October 9, 2009, Goodwin wired $30,000 to Michelle Sainz,[6] which was labeled "IT Payment." Syed testified that this payment had nothing to do with purchasing a financial instrument or accessing financing for the green park. From October 9 to October 13, 2009, Goodwin transferred $140,000 total to Syed directly in multiple transactions and to multiple accounts he held; some of these transactions were labeled bond fees. On October 13, 2009, Goodwin transferred $530,613.59 to USA Global.[7] Goodwin withdrew a total of $41,646.41 from the account for himself. This appears to include a $28,018 withdrawal on October 9, a $552.14 check, and a $13,076 withdrawal on October 19. These transactions included descriptions of "Dan Law Firm," "GLF reimbursement of fees," and "GLF RET." Syed testified that Goodwin was only supposed to be paid for his work once USA Global got funded. On October 14, 2009, Goodwin issued a $2,500 check to his childhood friend, Robert Feickert ("Feickert"), and a $5,000 check to Brecor LLC, a company that Feickert owned. No one from Elza Construction authorized Goodwin to send its funds to accounts other than USA Global.

Emails before or contemporaneous with the wire transfer show Goodwin arranging to send the funds to various other accounts. On October 8, 2009, the day that Elza transferred the

---

[5] The transfers included notations which were entered into the comment section of the transfer request by the person making the transfer and purported to be the purpose for the transfer. As Syed testified, it would not matter if the transfer were called a "bond fee" if the transfer did not actually conform to the Agreement.

[6] Michelle Sainz was Joe Sainz's wife. Joe Sainz managed USA Global's systems and files.

[7] The USA Global account did not exist until October 13, 2009. Syed used a $100 personal check to open the account. Syed also extracted $15,000 from the USA Global account and transferred it to himself. Amounts from USA Global were then also sent to Nevada Asset and Property Management, Tri-Gate Global, and Fourth Third, LLC/Medley Capital.

$1.32 million to the Goodwin law firm but before the funds had been wired, Goodwin emailed Amy Myers from Global Green to ask how much of the Elza Construction money would go to Global Green. He said, "When it is decided, I would like all parties to sign off on a distribution sheet before I send any money out." (Gov't Appendix, Exhibit 39, at 40.) Later that day, Goodwin emailed Myers with an attached escrow ledger from Tarrant. The ledger provided that $1,020,000 would go to USA Global and $300,000 would go to Global Green. Goodwin again asked for someone from Global Green to sign off on the ledger so he could be "sure all parties are in agreement with the distribution schedule." (*Id.* at 41.) Syed testified that the references to "parties" did not include anyone from Elza Construction. Myers also testified that Goodwin meant only USA Global, Goodwin, and Global Green. As indicated above, Goodwin did indeed transfer $300,000 of the funds to Global Green consistent with the earlier emails, and in contravention of the terms of the Agreement.

The government also produced evidence that this was not the first or last time Goodwin helped further the scheme. Goodwin become a party to other escrow agreements with other contractors on the green park project. These other contractors included Qualico Steel, Pinnacle Management, J.B. Coxwell Contracting, and Fleming Building Company. The contractors entered into escrow agreements that were substantially the same as the one with Elza Construction. These agreements provided for the transfer of funds from the contractor to The Goodwin Law Firm Legal Trust Account for further release to USA Global to leverage the funds with amounts being paid back to the contractor within a specified time frame. These agreements were all made within a couple months of each other. The Qualico Steel agreement came before the Elza Construction agreement on September 30, 2009, and the others came after the Elza Construction agreement in October and November 2009. Qualico Steel transferred $840,000 to The Goodwin Law Firm

Legal Trust Account, Pinnacle transferred $220,000, J.B. Coxwell Contracting transferred $840,000, and Fleming Building Company transferred $840,000.

Although these contracts also called for the money to go to USA Global, these funds were also sent elsewhere by Goodwin. For instance, on October 1, 2009, Qualico Steel wired $840,000 to The Goodwin Law Firm Legal Trust Account. The following day, Goodwin transferred $800,975 to United Strategic Alliance, a company affiliated with Tarrant and Syed. Goodwin also transferred $38,975 of Qualico's funds to Global Green. On October 20, 2009, Pinnacle Management wired $220,000 to The Goodwin Law Firm Legal Trust Account. On October 23, 2009, Goodwin wired $20,000 to Global Green, and then on October 28, 2009, Goodwin sent $199,950 to Global Green. On November 16, 2009, J.B. Coxwell Contracting wired $840,000 to The Goodwin Law Firm Legal Trust Account. On November 17, 2009, Goodwin wired $839,800 to Global Green. Later, there was a "debit memo" for Goodwin dated November 20, 2009 for $10,000. On November 20, 2009, Fleming Building Company wired $840,000 to The Goodwin Law Firm Legal Trust Account. On November 24, 2009, Goodwin sent $839,950 to Global Green. No one from these other companies authorized the transfer of their funds to any party other than USA Global. These contractors also testified that they would not have signed the agreement if they knew they were not going to get their money back within the specified time frame. And the contractors testified that they would not have agreed to send their money to Global Green.

As with the Elza Construction money, Goodwin was arranging to send the money from the other contractors contrary to the agreements before the funds even arrived in his escrow account. For instance, with the Qualico Steel money, Goodwin, Bennett, and Tarrant had indicated where the money would be sent two days before the Agreement with Qualico Steel was signed. An email to Goodwin and Tarrant contained a disbursement sheet approved by Bennett. That sheet said

Qualico's $840,000 would be divided up with $340,000 going to Global Green, and $500,000 being applied to the instrument. Jed Downs of Qualico Steel testified that he thought all the money was supposed to be applied to the instrument.

Further, letters indicated that Goodwin, Syed, and Bennett had agreed that all of J.B. Coxwell Contracting and Fleming Building Company's money would go to Global Green. Syed testified that he had reservations about "redirect[ing]" the money given by the contractors to Global Green. (R. 203, Trial Tr., PageID # 1761, 1763, 1765.) When asked why he would sign "seen and agreed" on the letters involving J.B. Coxwell and Fleming's money if he knew the money was not supposed to go to Global Green, Syed responded that he had raised his reservations about sending the money to Global Green in contravention of the agreement with both Tarrant and Goodwin. (*Id.* at # 1761, 1763.) Apparently, he signed off on the division of funds "Because I was told by Mr. Goodwin, and also informed by Mr. Bennett that it -- it is part of their agreement or they have an understanding that was to happen." (*Id*. at # 1761.) Syed testified that they "were all resigned to the fact that that money was going to go back to Global Green at that point, but with reservations." (*Id*. at # 1763.)

Next, the government produced evidence that Goodwin knew prior to the Elza Construction money transfer that USA Global had no legitimate sources of financing, and never had. For instance, when Goodwin first came on as independent counsel for USA Global in 2008, Tarrant and Syed explained what USA Global was doing and provided an overview. As part of his overview, Syed and Tarrant provided Goodwin with a document that they gave to clients who needed funding on their projects, like Global Green. The trust overview document was addressed to potential clients and said:

> USA Global Holdings Business Trust has established investor pool and bank credit
> line. That service is the Trust position. All projects are collateralized with bank-

qualified instruments that are fully callable investment-grade instruments and corporate bonds -- and corporate bond is insured to obtain investment-grade rating. . . . We have access to a large financial reserve of assets and capital annually to fund projects worldwide and want to stress the compliance requirement of the Trust due to the tremendous amount of project requesting of funding and structure of the Trust procedures for the funding of these projects. . . . Your funds are not at risk because we don't use them on project directly. They serve as proof of insurance, and we lien collateral or equity provided so we can draw on our own credit line to service your funding.

(R. 203, Trial Tr., PageID # 1700–02.) This document contained several false statements. Syed testified that when Goodwin became USA Global's independent counsel, there was no established investor pool and no established credit line. Syed also testified that USA Global did not have access to a large financial reserve of assets and capital and that USA Global had never actually funded a project. Syed also testified that there was no institution that was buying USA Global's bonds. Syed testified that Goodwin knew about the lack of financing.

In fact, the only potential source of funding at that point had been a fraud. In 2009, USA Global was introduced to Edward Accopian, who in turn introduced them to a senior director at Banco San Juan. USA Global gave Accopian $700,000 to "bring in an asset to fund these projects." (*Id*. at # 1714.) The money came from another client. USA Global ultimately learned that Accopian had made false statements, that the letter of a $500 million line of credit was false, and that they could not "draw a single penny on it." (*Id*. at # 1873, 1706.) On August 25, 2009, in a letter signed by Tarrant, USA Global requested that the $700,000 be returned for lack of performance. But Accopian had actually taken the money and run. Syed testified that Goodwin knew about this situation because he and Tarrant had discussed it with him. Between the time USA Global wrote this letter in August 2009 and October 2009, when the Elzas put in their money, USA Global had not accessed any other source of financing. Syed testified that Goodwin was aware of this fact.

The government produced evidence that USA Global remained in financial difficulty and that Goodwin knew of this fact. For example, on October 20, 2009, Goodwin emailed Syed that he did not think that a man named Candebat would fund any money. USA Global had hoped that Candebat would provide them with an asset to be funded in relation to the Global Green projects. In the email, Goodwin wrote, "it doesn't look good," and that if there were no money for clients, "all hell will break loose." (Gov't Appendix, Exhibit 60, at 45.) Syed testified that at that point in time, USA Global's financial situation was "next to none." (R. 203, Trial Tr., PageID # 1751.) Syed testified that he had doubts about whether USA Global could repay the Elzas, and that Goodwin appeared to share those doubts.

Further, on October 24, 2009, Goodwin emailed Syed advising him that he needed to start calling clients who were expecting bridge funding. Goodwin noted that USA Global "had not been able to perform as promoted." (Gov't Appendix, Exhibit 61, at 46.) Goodwin called for "frank, honest and direct discussion with the trustees and Global Green to salvage whatever might be left to salvage." (*Id.*) Goodwin did not call for "frank, honest and direct discussion" with the contractors. Syed testified that this was an accurate reflection of USA Global's dire situation at that point.[8]

The government also produced evidence that despite knowing of USA Global's financial situation, Goodwin continued to make false statements to the Elzas after initially diverting their money. For instance, on June 10, 2010, the Elzas received two letters.[9] The first was a letter from Goodwin in his capacity as counsel to USA Global that stated: "My client has indicated that all monies will be returned directly to an Elza Construction, LLC, appointed account. Further, my

---

[8] This email came before J.B. Coxwell Contracting and Fleming Building Company had signed escrow agreements and transferred money.

[9] These form the basis for the third count of wire fraud.

client has indicated that if for some reason the Manchester, Kentucky Green Park fails to get built and established, all monies will be immediately returned to Elza Construction." (R. 200, Trial Tr., PageID # 1135; R. 201, at # 1214.) Attached was another letter from Syed that provided that they expected funding for the green park by June 28, 2010. Syed's letter parroted Goodwin's: "Please be advised that all monies will be returned directly to Elza Construction, LLC, appointed account. Further, if for some reason the Manchester, Kentucky Green Park fails to get built and established, all monies will be immediately returned to Elza Construction, LLC." (R. 200, at # 1136–37.) However, Syed testified that these statements were false because there was no funding that was anticipated to take place by June 28, 2010.

On December 14, 2010, the Elzas emailed Goodwin asking whether they would receive funds before their "brother's place is auctioned off." (R. 201, PageID # 1227.) The email stated:

> We were told we would receive money by no later than December 17th, to take care of our equipment and our personal situation. This is a small amount in considering the millions of dollars that your team owes Elza Construction. If you cannot obtain the funds needed to take care of these emergency funds, we request that you send our $1.32 [million] to our account immediately. We expect that all of it is in one account ready to be sent back to us. It was supposed to be sent back to us January 2010. We have done nothing but show our loyalty and patience this past year. We haven't received no type of communication on this matter yet today. Lack of communication is really raising some red flags that you never intended on paying us, and that our $1.32 [million] has been misused. Someone needs to speak with us immediately.

(*Id.* at # 1228.) Goodwin responded to the email the same day, indicating that he and Tarrant would be meeting with a banker, and that they would call when they were finished.

Tarrant and Goodwin did call the Elzas, and Kyle Elza recorded it.[10] During the phone call, Tarrant represented that the project was legitimate, that they were confident the money was

---

[10] This call forms the basis for the fifth count of wire fraud.

coming in, and that Elza Construction would be repaid the full $1,320,000. Goodwin represented that their money had been properly used in the bonding process to secure the source of funds and that USA Global did what it was supposed to do. Goodwin also represented that Global Green's bonds were "real" and were a valid source of financing for the project. (CD, Gov't Exhibit 20.) Syed testified that Goodwin's statement that the money was used in the bonding process was a false statement. He testified that Goodwin knew the statement was false because only a portion of the money was used in the bonding process.

Later in December 2010, before Christmas, Goodwin wired $6,000 to the Elza family. In January 2011, Goodwin wired them an additional $1,000. At this point, the Elzas had been waiting 14 months for the return of their money. To send the money, Goodwin used the Goodwin Law Firm Escrow Agent for USA Global de Mexico account. This account was related to a separate Mexican iron ore project. The account was funded by $150,000 from the Lauler Corporation, owned by one of Goodwin's friends, Bill Lauler, and $600,000 from Robert Feickert and his family members.[11] During this time, Goodwin transferred larger sums of money than given to the Elzas to his personal account and to Tarrant from the USA Global de Mexico account.

Further, on August 11, 2011, Paul Elza received an email from Goodwin. The email included an attached report prepared by Tarrant and Syed with Goodwin's handwritten notes. In the email, Goodwin said that the $1,320,000 was "distributed in accordance with the escrow agreement." (R. 200, Trial Tr., PageID # 1139–40.) On the report, Goodwin's handwritten notes provided that a "Balance of $1,020,000 provided to and used by USA Global Holdings Business Trust for bonding expenses as we cited in this report." (*Id*. at # 1140.) It also said that $300,000

---

[11] Feickert understood that his money would be used to secure a line of credit for the iron ore project. Goodwin represented that the money would be returned in a few months, plus a profit. Goodwin never mentioned sending his money to the Elzas or to his personal bank account. Feickert never got any of his money back.

was wired directly to Global Green at their request. However, Syed testified that it was false for Goodwin to represent that $1,020,000 went to USA Global because that amount of money did not go to USA Global. Furthermore, it was false for Goodwin to suggest that the money was distributed in accordance with the Agreement.

Finally, the government produced additional evidence that Goodwin actually played a role assisting USA Global in negotiating financing and in soliciting financing. For instance, on April 19, 2010, Lewis, the then-mayor of Manchester, received an email from Goodwin that said, "I do not have a definite funding date as of this writing. However, I am in the final stages of negotiations with the banks who will be providing USAG with the source of funds for it to complete its obligations. My client is pledging some of its assets as collateral in order to secure financing." (R. 202, Trial Tr., PageID # 1489–91.) Syed testified that Goodwin was referring to himself regarding the final stages of negations, rather than anyone else at USA Global. Syed testified that Goodwin participated in the negotiations with respect to financing. Syed also testified that the final statement was false because USA Global did not have any assets, and that Goodwin knew about this.

Further, the government produced evidence that Goodwin played a role in soliciting financing. When soliciting financing, Goodwin also made misrepresentations. For example, on February 12, 2009, Goodwin sent a letter to King Global Development, LLC, a potential client. The letter said, "As you are aware, this firm is counsel to USAG. Please be advised that USAG has currently established lines of credit with several banks throughout the world totaling $500 million. The lines of credit are available to USAG and are drawn against by USAG to fund projects." (R. 202, Trial Tr., PageID # 1438–39.) Syed testified that the mention of the $500 million line of credit was false because there was no such line of credit. At that time, USA Global

had been given a "letter of a $500 million line of credit from Banco San Juan," which, as detailed above, was "just a letter," and they could not "draw a single penny on it." (R. 203, Trial Tr., PageID # 1706.) Syed testified that Goodwin had reason to know of that fact, and that he or Tarrant had discussed with Goodwin that there was no access to that money. A letter written that same day and signed by Goodwin said that King had not yet provided the "necessary investment of $5 million to participate in the [USA Global] funding project." (R. 202, Trial Tr., PageID # 1440.) The letter further stated that if King provided the $5 million, USA Global would return that $5 million, plus an additional $2.5 million fee for the use of the funds within 60 days of the initial payment.

Next, on February 13, 2009, Goodwin sent a letter to ME&A Capital LLC regarding a bridge loan to Global Green. USA Global was to serve as the exit for the bridge loan. Goodwin's letter explained how ME&A would have their loan paid back. The letter indicated there was a $500 million credit line and referred to $750,000,000 and $525,000,000 in corporate bonds. Finally, the letter indicated that USA Global had arranged for "the purchase of the bond, once issued, by a banking institution with which it has a long standing business relationship." R. 203, Trial Tr., PageID # 1710.) Syed testified that the mention of the line of credit was false. Syed also testified that there were no actual funds behind the $525 million and $750 million in bonds. Finally, Syed testified that he was not aware of any bank with which USA Global had a long-standing business relationship. Syed testified that Goodwin was aware of this.

On April 3, 2009, Goodwin sent a letter to First National Management Group, LLC. Again, Goodwin represented that USA Global currently had $500,000,000 in established lines of credit with banks around the world. He also represented that "[a]s of today," more than $2,000,000 was readily available for use by USA Global. (*Id*. at # 1712.) Finally, he indicated that USA Global

would have $20,000,000 available for use within three weeks. Syed testified that the information in the letter was not correct. Syed testified that Goodwin knew the information was not true.

Finally, as USA Global and Global Green were unable to get funding for the Manchester project, they told the contractors about a Mexican iron ore project. Tarrant, Goodwin, and Syed communicated with the Elzas about the Mexico project. They told the Elzas that funding the Mexico project would enable USA Global to pay the Elzas back. Syed testified that Goodwin was "hands-on" with the project. (*Id*. at # 1774) Goodwin also successfully solicited funding from Feickert for the project.

In light of all this evidence, a rational jury could have found that Goodwin knowingly and willfully joined in on a scheme to defraud and that Goodwin had the requisite intent to defraud. *See Jackson*, 443 U.S. at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). First, a rational jury could have found that there was a scheme to defraud—that there was a plan or course of action in which Goodwin, along with Bennett, Syed, and Tarrant, used false, deceptive, or fraudulent representations or promises to persuade the Elzas and the other contractors to place their money in Goodwin's escrow account and then use the funds for purposes other than what they were solicited for.

Next, a rational jury could have found that Goodwin knowingly and willfully participated in this scheme to defraud. By signing the agreements, Goodwin made promises that he would handle the contractors' money in a particular way, that he would return the funds pursuant to a specified schedule, and that, if USA Global were unable to fund the loan, he would return the money immediately. However, a jury could have found that, although Goodwin knew he was supposed to transfer all the money to USA Global, he knew in advance that he would not distribute

the money in that way, but instead would distribute the funds in the way that Bennett, Syed, Tarrant, and he agreed. A jury also could have found that Goodwin knew the money was not being—and would not be—used to purchase an instrument, but was going towards, for example, "IT payments" and into his own personal account. *See United States v. Whitfield*, 663 F. App'x 400, 406 (6th Cir. 2016) (finding sufficient evidence supported the defendant's wire fraud conviction when he "falsely told his customers, both through his own statements and those of others, that their funds would be held and later allocated to the proper parties").

A jury could have found that Goodwin knew that no funding was in place, or had ever been in place, and that USA Global was in dire financial straits. Consequently, a jury could have found that Goodwin knew he would not be able to return the money pursuant to the schedule and knew that USA Global would not be able to pay the contractors back after improperly diverting their money. *See United States v. Edwards*, 526 F.3d 747, 756 (11th Cir. 2008) (concluding that there was sufficient evidence for a wire fraud conviction and pointing to the fact that the defendant knew "ETS was 'hemorrhaging money' and unable to sustain its operations without a constant influx of investment capital," but was courting "both new and existing investors with assurances that ETS was financially sound and profitable" and "never disclosed to his investors that ETS would be unable to buy back the payphones, as required by its leases").

A jury could have further found knowing and willful participation from Goodwin's subsequent representations to the Elzas that their money had been disbursed properly and that all their money would be returned. Indeed, a rational jury could have found that Goodwin knew he had not distributed their money in accordance with the Agreement, and that he had omitted key details about where their money had in fact gone. A rational jury could have found that Goodwin knew Elza Construction's money would not be returned because USA Global was in no position

to pay anyone back. Lastly, a jury could have found that Goodwin actively participated because he played a role in soliciting clients for funds and in negotiating financing.

Finally, a rational jury could have found that Goodwin acted with the intent to deprive the victims of money. Again, "[i]ntent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *Davis*, 490 F.3d at 549. A jury could have found that Goodwin made misrepresentations, knew about the activity, profited from the activity, and attempted to conceal the activity. As described above, a jury could have found that Goodwin made several misrepresentations about how he would handle the contractors' money and knew that those representations were false. He also made misrepresentations about how he handled the money after the fact and about whether the money would be returned. Also, as detailed above, a jury could have found that Goodwin knew that he violated the terms of the agreement, that the funds were not being used for the purposes for which they were solicited, that USA Global was in a dire financial situation, and that he would not be able to keep promises that money would be returned. *See United States v. Stalnaker*, 571 F.3d 428, 437 (5th Cir. 2009) (concluding that jury could infer that the defendant possessed the requisite intent to defraud in part because she "violated instructions from the lending company that she 'not close the loan or disburse the funds' until receiving the down payment from the borrower" and instead "disbursed the funds immediately").

A jury also could have found that Goodwin made efforts to conceal his activity. For example, a jury could have found that he hid the truth of what happened with Elza Construction's money by falsely representing to the Elzas that he had distributed the proceeds in accordance with the agreement and by omitting where the money had really gone. Additionally, a jury could have found that he tried to conceal what he had done when he lied to Paul Elza. Paul asked Goodwin if

he personally took any of the $1,320,000, and Goodwin responded that "he never got a penny of it." (R. 200, Trial Tr., PageID # 1141.) Additionally, a rational jury could find that Goodwin profited from the scheme. A jury could have found that Goodwin took $41,646.41 from the Elza Construction funds for himself. A jury also could have found that Goodwin profited $10,000 from the J.B. Coxwell Construction funds given to Global Green. *See United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003) (finding that the jury could infer a sufficiently culpable mental state based on evidence that the defendant "transferred funds by wire from the Partnership account and placed them in his personal account; that he used the funds in his personal account to invest in high risk investments, in direct contravention of the terms of the Partnership Agreement; that he hid these actions from his partners; and that he misrepresented to his partners the status of the Partnership account, including the profits allegedly made and the amount of commissions he withdrew"). Considering the efforts to conceal the unlawful activity, the misrepresentations, the proof of knowledge, and the profits, a jury could have inferred that Goodwin acted with intent to deprive Elza Construction of money or property.

By contrast, Goodwin argues that he was "just the lawyer and escrow agent," and "was nothing more than an outside counsel." (Goodwin Br. at 21.) He highlights that he "was not involved in his client's day-to-day operations, was not a business partner, had no experience in the types of bonds that USA Global was dealing in, [and] had no signatory authority on USA Global's bank accounts." (*Id.*) But the evidence as a whole and when viewed in the light most favorable to the prosecution contradicts Goodwin's argument. As already described, a jury could have found that Goodwin was much more than "*just* the messenger and forwarder of information" and not "*simply*" the attorney and escrow agent to guilty parties. (*Id*. at 1, 22 (emphasis added).) *See United States v. Lanier*, 879 F.3d 141, 146–47 (5th Cir. 2018) (rejecting an attorney's argument

that he only provided limited, routine, and proper legal services because the record contained ample evidence that he "knowingly acted to further [his client's] scheme").

Goodwin's arguments appear to urge the Court to accept innocent and defendant-friendly interpretations of the evidence. But the Court is legally required to view the evidence in the light most favorable to the government. *United States v. Cunningham*, 679 F.3d 355, 371 (6th Cir. 2012); *United States v. Dierker*, 417 F. App'x 515, 521 (6th Cir. 2011). And Goodwin already presented those innocent interpretations to the jury, which rejected them in light of the government's evidence. *See United States v. Benchick*, 725 F. App'x 361, 366 (6th Cir. 2018) ("Benchick's wire fraud arguments . . . amount to innocent explanations for suspicious conduct. He presented those arguments to the jury, which rejected them in light of substantial evidence offered by the prosecution. It is not our place to second guess its judgment; we decline Benchick's 'invit[ation] . . . into the forbidden territory of re-weighing the evidence.'" (quoting *United States v. Dimora*, 750 F.3d 619, 627 (6th Cir. 2014)).

Finally, as to Counts 3 and 5, Goodwin contends that "[b]ecause those communications post-dated the October 2009 transfer of the money, they were after the fact transmissions that could not possibly have been material to an intent to defraud at the time the money was transferred." (Goodwin Br. at 38.) Goodwin cites *United States v. Lazarenko*, in which the Ninth Circuit held that transfers made three or four years after the original scheme were not "in furtherance" of the defendant's original scheme. 564 F.3d 1026, 1036–37 (9th Cir. 2009). This Court has rejected similar arguments about timing. *See Daniel*, 329 F.3d at 487. And this Court has previously concluded that a communication sent after the transfer of money was still in furtherance of the fraudulent scheme when it was "designed to have a lulling effect" on the victims that would "postpone their ultimate complaint to the authorities, and therefore make the apprehension of the

defendants less likely than if no [communication] had taken place." *Faulkenberry*, 614 F.3d at 582 (citation omitted). The jury had a sufficient basis to conclude that the two communications in question—the June 11, 2010 letter (Count 3) and the December 2010 recorded phone call (Count 5)—were designed to have a lulling effect upon the Elzas because they prolonged the Elzas' belief that their money had been properly used and that they would be receiving their funds imminently.

Because a rational jury could have found the elements of wire fraud beyond a reasonable doubt, we affirm Goodwin's convictions for wire fraud.

## B.     Conspiracy to Commit Wire Fraud

Under 18 U.S.C. § 371:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined . . . or imprisoned . . . or both.

To prove conspiracy to commit wire fraud, the government must prove: (1) an agreement among two or more persons to commit an act of wire fraud; (2) knowing and willful participation in the conspiracy; and, (3) an overt act in furtherance of the conspiracy. *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007); *see also Jamieson*, 427 F.3d at 402. "A tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement, and a conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan." *United States v. Speer*, 419 F. App'x 562, 566 (6th Cir. 2011) (alteration omitted) (quoting *Hughes*, 505 F.3d at 593). "Just as the conspiracy may be inferred from circumstantial evidence, a defendant's knowledge of and participation in a conspiracy also may be inferred from his conduct and established by circumstantial evidence." *Id*. at 566 (quoting *United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008)).

On appeal, Goodwin argues that the government did not prove that he was a knowing and willful participant in the conspiracy. Part of this argument is based on Goodwin's contention that "the government produced no evidence that Goodwin knew that Bennett, Syed, and Tarrant were actually attempting to defraud the Elzas." (Goodwin Br. at 23.) Goodwin asserts that he merely "worked for the alleged co-conspirators." (*Id*. at 24.)

The evidence viewed in the light most favorable to the prosecution once again contradicts Goodwin's argument. And for many reasons already explained, a rational jury could have found that Goodwin knowingly and willfully participated in the conspiracy. For instance, a jury could have looked to the emails between the parties arranging where the money received from Elza Construction, and the other contractors, should go in advance of the receipt of any money. Goodwin, who was in control of the money, effectuated their agreement and transferred the funds to places they were not supposed to go, including to himself. A jury also could have found he was a knowing and willing participant in the conspiracy by looking to his communications to the Elzas misrepresenting that he had disbursed their money in accordance with the Agreement and that they would get paid. A jury also could have looked to the telephone call made to the Elzas by Tarrant and Goodwin in which Goodwin again made false statements about the Elzas' money.

Because a jury could have found that Goodwin knowingly and willfully participated in the conspiracy, Goodwin's sufficiency challenge fails. We affirm Goodwin's conviction for conspiracy to commit wire fraud.

## CONCLUSION

Because the evidence was sufficient for a rational trier of fact to convict Goodwin of wire fraud and conspiracy to commit wire fraud, we **AFFIRM** the judgment of the district court.